UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA BRYAN,                    :
                                   :CIVIL ACTION NO. 3:17-CV-2248
          Plaintiff,               :
                                   :(JUDGE CONABOY)
          v.                       :
                                   :
NANCY A. BERRYHILL,                :
Acting Commissioner of             :
Social Security,                   :
                                   :
          Defendant.               :
                                   :
_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Acting Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). (Doc. 1.) Plaintiff protectively filed an application on September 4, 2014, alleging disability beginning on November 7, 2011. (R. 10.) After Plaintiff appealed the initial October 29, 2014, denial of the claim, a hearing was held by Administrative Law Judge ("ALJ") Daniel Balutis on August 16, 2016. (*Id.*) ALJ Balutis issued his Decision on August 31, 2016, concluding that Plaintiff had not been under a disability, as defined in the Social Security Act ("Act") from August 30, 2012, through the date of the Decision. (R. 16.) Plaintiff requested review of the ALJ's decision which the Appeals Council denied on October 17, 2017. (R. 1-6.) In doing so, the ALJ's decision became the decision of the Acting Commissioner. (R. 1.)

Plaintiff filed this action on August 11, 2017. (Doc. 1.)

She asserts in her supporting brief that the Acting Commissioner's determination should be reversed for the following reasons: 1) the ALJ failed to provide adequate explanation for ignoring evidence concerning absenteeism; 2) the ALJ's rejection of Plaintiff's claim that she, on frequent occasions, suffers from pain of sufficient intensity to preclude her attendance at work is not supported by substantial evidence; and 3) the ALJ fails to give appropriate weight to the opinion of the treating physician. (Doc. 9 at 8-9.) For the reasons discussed below, the Court concludes Plaintiff's appeal is properly denied.

## I. Background

Plaintiff was sixty years old at the time of the ALJ Hearing. (R. 54.) She has a GED and vocational training to be a machinist. (R. 57-58.) She has past relevant work as a shipping clerk/shipping checker, office clerk, and electrical assembler. (R. 16.) Plaintiff alleged that her ability to work was limited by a back injury. (R. 184.)

### A. *Medical Evidence*

Walter C. Peppelman, D.O., of the Pennsylvania Spine Institute performed an Independent Medical Examination on June 4, 2009. (R. 275-78.) Though before the alleged onset date of November 7, 2011, the report provides historic perspective of Plaintiff's back symptoms, many of which she said she had for twenty years. (*See*, *e.g.*, R. 71, 74.) Plaintiff presented with complaints of back pain

which she had since 1996.  (R. 275.)  She reported that none of the treatments (which included facet injections, nerve blocks, bracing of her lumbar spine because of subjective complaints of low back pain) had provided any long term periods of relief.  (R. 275.)  Dr. Peppelman performed a back examination and recorded the following:

> She complains of tenderness to deep palpation at the lumbosacral junction towards the sacroiliac joints bilaterally and up towards the mid lumbar area.  She has no associated paravertebral spasms.  She does not complain of any pain with head or shoulder compression.  The patient does not show any findings of symptom magnification and inappropriate illness behavior.  The patient is able to heel-toe walk.  She complains of pain when bending forward at about fingertips to knees and extends from 15 to 20 degrees with no problem.  She has a nondyskinetic ambulatory gait.  Examination of her lower extremities reveal all deep tendon reflexes equal and symmetric.  There is no evidence of any clonus or Babinski's.  Negative sitting root sign and negative straight leg raising. No evidence of any sensory or motor deficits. No evidence of any ankle clonus.  Good range of motion of hips, knees and ankles.
>
> The examination of the patient was an absolutely normal exam.  She has subjective complaints but no objective findings.

(R. 276-77.)

Dr. Peppelman also reviewed several MRIs of Plaintiff's back, the last of which had been done in January 2008, and stated that they revealed "normal axial and sagittal alignment only minor degenerative and normal aging changes of the lower lumbar spine." (R. 277.)  He added that the MRI "actually looks younger than the

3

patient's age.  The discs are well hydrated.  There are no disc herniations or nerve root compression and nothing at all from an anatomic standpoint that explain the vast subjective complaints offered by the patient." (*Id.*)  Dr. Peppelman also noted that between 2004 and 2008, the MRIs showed very slight increased changes at the L4-L5 interval with slight spondylolisthesis present. (*Id.*)  He added that "spondylolisthesis is present in a very high percentage of females in the late forties and continues to progress." (*Id.*)  Dr. Peppelman found that

> [t]he chronic pain syndrome is her subjective complaint and is not, nor has it been, in any previous medical records founded with any type of radiographic or clinical objective findings.  This was the accepted injury [from the alleged work-related event in 1996] and [she] was able to go back to work within those restrictions and now, because of subjective complaints only, the patient takes herself off of work on a rather routine basis.

(*Id.*)  He reiterated that Plaintiff did not have "any radiographic or MRI evidence that would create any impairment" and her subjective complaints of back pain "did not correspond to any anatomic abnormality nor is there any clinical objective findings that substantiate any pathology creating impairment." (*Id.*)  Regarding alternative explanations for Plaintiff's complaints, Dr. Peppelman opined that her complaints were "psycho-social issues and are not related to any mechanical or developmental problems within the patient's spine." (R. 278.)

4

The last MRI to which Dr. Peppelman referred, the study done on January 4, 2008, showed the following: 1) a stable appearance when compared to the 2007 study; 2) disc protrusion at L-5-S1 with left facet arthrosis, discogenic disease, bulging, and spondylosis abutting the left S1 nerve root; 3) facet arthrosis resulting in grade 1 spondylosis at L4-L5; 4) spodylosis and disc bulging at L1-L2 and L2-L3 associated with Schmorl's nodes and chronic superior endplate compression deformity with loss of height; 5) stable L5 cystic lesion; and 6) a cystic lesion in the anterior aorticocaval region. (R. 277, 293.) Other 2008 and 2009 studies indicated that the lumbosacral spine remained stable and unchanged from earlier studies. (R. 284, 287, 289.)

Closer to the relevant time period, Plaintiff had a lumbar spine MRI on January 19, 2011. (R. 280-81.) At the time, Plaintiff was seeing Rene R. Rigal, M.D., for pain management. (*See*, *e.g.*, R. 352-60.) Dr. Rigal noted that the new study did not demonstrate any changes compared to the MRIs of January 2008 and June 2009 and there continued to be a grade 1 spondylolisthesis with 2mm offset at L4-5. (R. 352.)

At Plaintiff's May 16, 2011, office visit, Dr. Rigal noted that Plaintiff had bilateral L4-5 joint ablations on April 20, 2011, and the procedure provided Plaintiff with total relief. (R. 356.)

Plaintiff reported to her primary care doctor, John

5

Pellegrino, D.O., on June 11, 2011, that she was having low back pain and the last shot she received did not even last a month. (R. 494.) No problems were recorded on physical examination and Dr. Pellegrino assessed "back pain." (*Id.*)

On August 8, 2011, Plaintiff was seen by Cheressa Mix, PA-C, at Dr. Pellegrino's office for follow up on her back pain. (R. 493-94.) Plaintiff reported that she had taken a different job at work "because she was tired of being harassed by her supervisor." (R. 492.) She also said she did not like her new position because it required her to be up and down frequently which was harder on her back. (*Id.*) No problems were noted on physical exam. (*Id.*)

Plaintiff returned to Dr. Rigal on September 13, 2011, after having last been seen on May 16th. (R. 358.) Dr. Rigal noted that the April 2011 ablation "provided the patient total relief of her symptoms until recently when her pain returned." (*Id.*) Physical examination showed the following: no pain upon movement of the spine at the waist; pain on forward flexion at 60 degrees, lateral rotation to 2 degrees, lateral tilt or hyper extension to 2 degrees; negative straight leg raising to 90 degrees; deep tendon reflexes preserved bilaterally and symmetrical; no motor or sensory deficits; mild paraspinal tenderness upon palpation; and no tenderness of the sacroiliac joints or sciatic notch. (R. 359.) Dr. Rigal planned to schedule Plaintiff for bilateral L4-5 facet joint ablations. (*Id.*)

In December 2011, Plaintiff saw Shiyi Abla-Yao, M.D., of Central Penn Interventional Pain Medicine. (R. 457-60.) Plaintiff reported to Dr. Abla-Yao that she had chronic back pain related to a work injury in 1996 and that she had persistent pain since then. (R. 457.) Plaintiff described the pain as constant with numbness and radiation of pain to the posterior aspect of the thighs. (*Id.*) She also said the problem was aggravated by bending and twisting, and she had experienced some relief with previous physical therapy. (*Id.*) Physical examination showed limited range of motion of the back and tenderness to palpation of the mid-lumbar region. (R. 460.) Dr. Abla-Yao determined that treatment with a TENS unit was appropriate to address the back pain. (*Id.*)

On January 19, 2012, Plaintiff reported to Dr. Abla-Yao that she was stable with the TENS use for the treatment of her back pain and she had no complaints at that time. (R. 453.) However, Dr. Abla-Yao also noted that Plaintiff reported dull pain and the problem was mild. (*Id.*) Musculoskeletal exam showed no limitation of the range of motion of the back and no other problems were recorded. (R. 455.)

Ms. Mix again saw Plaintiff on March 20, 2012, for Plaintiff's annual exam. (R. 491.) Plaintiff reported that she had been fired from her job, she was doing well other than back pain, and she was seeing Dr. Abla-Yao for pain management. (*Id.*) Again, no problems were noted on physical exam. (*Id.*)

A March 23, 2012, MRI showed no interval change from the previous MRI dated January 19, 2011. (R. 373.)

Plaintiff saw Dr. Pellegrino in Septemeber 2012 and reported that her pain was improved since she stopped working. (R. 488.) No problems were noted on physical exam. (R. 488.) When Plaintiff saw Dr. Pellegrino for her annual exam on March 21, 2013, Plaintiff said she continued to have low back pain and she saw Dr. Abla-Yao for injections. (R. 486.) Again no muculoskeletal problems were noted on physical exam. (R. 486.)

When Plaintiff saw Dr. Abla-Yao on March 26, 2013, Plaintiff complained of back pain. (R. 409.) Dr. Abla-Yao noted that Plaintiff was being seen for acupuncture, she had good pain relief, and she had good activity levels. (*Id.*) Physical exam showed tenderness to palpation of the lumbar region of the back. (R. 411.) On April 2, 2013, Dr. Abla-Yao again noted that Plaintiff complained of back pain and was being seen for acupuncture treatment. (R. 405.) Dr. Abla-Yao also noted that Plaintiff had good pain relief and good activity levels, and she did not take much pain medication. (*Id.*) She added "there are no associated symptoms. The problem is located in the lumbar region over spine. She reports dull pain. The back pain is mild. It does not impair her activities of daily living." (*Id.*) Dr. Abla-Yao again found tenderness to palpation of the lumbar region. (R. 407.)

A lumbar spine MRI done on April 3, 2013, showed no

8

significant change from the previous study done on March 23, 2012. (R. 370-71.)

In September 2013, Plaintiff reported to Dr. Pellegrino that her insurance would not pay for more acupuncture and she had more back pain. (R. 484.) In November, Plaintiff reported that she had continuing problems with her insurance and Workmen's Comp, including difficulty getting Flexeril and the Duragesic patch. (R. 482.) In December, Plaintiff said she was doing better with the pain patch. (R. 480.) On January 16, 2014, she again reported doing well with the patch and she denied any other problems. (R. 478.)

Plaintiff saw Dr. Abla-Yao on January 20, 2014, at which time she reported that, although she had good relief from past acupuncture, the pain had increased again, and she was interested in receiving an injection to further improve her pain. (R. 383.) Plaintiff denied numbness but reported radiation of pain and she said the lumbar pain worsened with bending, lifting, and walking, and was aggravated by standing. (*Id.*) Dr. Abla-Yao noted that the problem was mild to moderate. (*Id.*) Physical examination showed limited range of motion of the back and tenderness to palpation of the lumbar region. (R. 385.) Dr. Abla-Yao scheduled Plaintiff for further lumbar/sacral injections which she administered on February 19, 2014. (R. 386, 388.)

Also on February 19, 2014, Plaintiff saw Dr. Pellegrino and

reported that Dr. Abla-Yao had just given her a steroid injection, she still had a lot of pain, and she wanted to increase the dosage of the pain patch.  (R. 476.)  Dr. Pellegrino encouraged Plaintiff to continue physical therapy.  (R. 477.)

On March 20, 2014, Plaintiff reported to Dr. Abla-Yao that she had about 70-80% relief, she denied numbness or radiation of pain, the pain was mild to moderate, and it was worsened by bending, lifting, and walking.  (R. 392.)  Physical exam showed pain with movement of the back and no limitation of the range of motion of the back.  (R. 394.)

Plaintiff saw Dr. Pellegrino for her annual exam on April 10, 2014, at which time Plaintiff complained of chronic back pain and said she was trying to get Social Security because she was unable to work.  (R. 474.)  Dr. Pellegrino did not note any musculoskeletal problems on physical examination and ordered a lumbar spine MRI.  (R. 477-75.)

The April 18, 2014, MRI of the lumbar spine showed no significant change from the 2012 and 2013 studies.  (R. 608-09.)

On May 22, 2014, Plaintiff reported to Dr. Pellegrino that she was unable to get the Duragesic patch prescription refilled, she took her last patch on May 14th, and she felt miserable.  (R. 472.) Dr. Pellegrino gave Plaintiff another prescription for the pain patch.  (R. 473.)  On June 25th, Plaintiff continued to complain of pain despite using the pain patch again.  (R. 470.)  On August 18th,

Plaintiff reported that she had an injection scheduled with Dr. Abla-Yao later in August. (R. 467.) Plaintiff also said her pain was worse related she was only able to take Celebrex once a day because her insurance paid for just thirty tablets a month. (*Id.*)

Plaintiff returned to Dr. Abla-Yao on August 27, 2014. (R. 400.) She complained of lumbar pain and reiterated the effectiveness of previous treatment. (*Id.*) She reported radiation of pain into lateral thighs, she described the problem as moderate, and she noted that the pain was improved with acupuncture, alleviated by the application of heat and narcotics, and worsened by bending, lifting, and walking. (*Id.*) She also noted that the problem impaired her activities of daily living. (*Id.*) Physical exam showed back pain with extension and lateral rotation, tenderness to palpation of the lumbar region bilaterally and the sacroiliac region, and positive Patrick's bilaterally. (R. 402.) Plaintiff received an injection in the sacroiliac region with further injections planned. (R. 403.)

On September 22nd, Plaintiff reported to Dr. Pellegrino that the injection was helpful and she was feeling better. (R. 465.) She reported the same on October 27th. (R. 669.)

At her November 13, 2014, visit with Dr. Abla-Yao, Plaintiff reported that she had been doing well since her injection except for some right buttock pain. (R. 625.) Physical examination showed pain with movement but no limitation of range of motion of

the back, and tenderness to palpation of the right lumbar region. (R. 624.) Dr. Abla-Yao discussed pool exercises and noted that Plaintiff would call for follow up as needed. (R. 625.)

In January 2015, Plaintiff reported to Dr. Pellegrino that she was under a lot of stress, she had been taking care of her father who had a stroke, she continued to have pain although Dr. Abla-Yao's injections had been helpful, and she wondered if there was anything else she could do. (R. 667.) In February 2014, Dr. Pellegrino noted that Plaintiff had an appointment at the Mount Nittany Pain Center. (R. 665.)

Scott Bulter, PA, of the Mount Nittany Pain Clinic dictated a Consultation Report on April 5, 2015. (R. 604-06.) The report contains an extensive history which indicates that Plaintiff reported developing back pain after liftng a heavy object at work in 1996 and had persistent pain in the lumbar spine since then. The Consultation Report states that Plaintiff

> reports radicular symptoms, . . .
> predominantly numbness and cold sensation
> traveling in an S1 distribution to the level
> of the foot. She reports her current
> symptoms are bilateral and equal in the
> lumbar region and describes a fairly constant
> throbbing and aching sensation with
> occasional stabbing, shooting and sharp
> pains. She describes numbness and cold
> sensations traveling in an S1 distribution to
> the level of the foot bilaterally and fairly
> equal. Her pain is a 5/10 at its best and
> 10/10 at its worst with ongoing use of
> fentanyl 50 mcg q. 72 hours. The patient
> reports that standing, sneezing, sitting,
> coughing and bending forward exacerbates her

12

symptoms for extended periods walking [sic].
She reports moderate relief from lying
supine.  She reports moderate relief from
application of heat and use the fentanyl
patch.  She reports prior history of
difficulty tolerating oral opiate analgesics.

The patient describes sleep disturbances
and gait disturbances as related to her pain
and discomfort. . . . She is currently
limited to performing minor household duties
and occasionally grocery shopping due to her
pain and discomfort.

The patient has previously been treated
with opioids, muscle relaxers, epidural
steroids, TENS unit, acupuncture and medial
branch block with subsequent radiofrequency
ablations.  The patient had reported 3-4
months of 60% relief of axial pain through
prior radiofrequency ablation most recent
performed on 10/2011 by Dr. Rigal in the
Williamsport area.  She denied benefit from
other interventional procedures in the past.
She does report an epidural procedure that
was performed 6-8 months ago, which was
somewhat helpful.  She is unable to quantify
benefit.

(R. 604-05.)  Examination of the back and spine showed slight loss

of lumbar lordosis, tenderness to provocative testing of the lumbar

fact joints at the L4 through S1 level bilaterally as well as the

S1 joints bilaterally, no other tenderness, no spasm or myoneural

trigger points, extension of 5-10 degrees, and flexion to

approximately 90 degrees with minimal increase in axial low back

pain.  (R. 605-06.)  Plaintiff's ambulatory function was normal.

(R. 606.)  The Treatment and Recommendation section of the report

noted "no significant abnormality upon review of her most recent

MRI from 2014 with a recommendation for "a diagnostic medial branch

13

block versus intraarticular facet joint injection at L4-L5 and L5-S1 level with level to be confirmed under x-ray the day of the procedure." (*Id.*) PA Butler noted that Plaintiff "may be a candidate for diagnostic S1 joint injection pending failure to respond to above," he saw "no utility to pursuing epidural steroid injections" at the time, and he encouraged Plaintiff to discuss diminished opiate dependency moving forward with her prescribing physician. (*Id.*)

On April 9, 2015, Jennifer Gilbert, D.O., of the Mount Nittany Pain Clinic administered a lumbar facet joint injection based on the diagnosis of "lumbar facet pain and lumbago." (R. 610.) On April 15th Plaintiff reported to Dr. Pellegrino that she was still in a lot of pain and the ablation done by Dr. Rigal had been more helpful. (R. 663.) Plaintiff said she was unable to lift anything, she had to make multiple trips to bring groceries in, and she was afraid of the Duragesic patch because it made her tired. (*Id.*)

Plaintiff reported through May and June 2014 that her pain continued. (R. 657, 661.) After receiving ablation of L4, L5, and S1 on July 15th, Plaintiff told Dr. Pellegrino that she felt well, she was having no pain, and she was doing everything she wanted to do. (R. 655.)

At her August 17, 2015, visit to Mount Nittany Pain Clinic, Plaintiff reported 75% sustained relief in her axial low back pain

14

and bilateral lower extremity paresthesias. (R. 620.) Plaintiff said she continued to use the TENS unit on a daily basis and the Lidoderm patch as needed. (*Id.*) She indicated that her pain was mild (2-3/10 at best and 6/10 at worst), she was performing daily living and ambulatory activities without significant limitation, she had no side effects to the procedure, and she was extremely pleased with the results. (R. 620.) Plaintiff made a similar report to Dr. Pellegrino on August 26th. (R. 653.)

At her October 27, 2015, visit with Dr. Pellegrino, Plaintiff reported that she felt well, she was not having pain, she was doing everything she wanted to do, medicines controlled pain, and she had no complaints. (R. 651.) She reported the same at her November 9, 2015, January 27, 2016, and February 29, 2016, visits. (R. 647, 649.) On March 30th and April 27th, Plaintiff reported more pain but she was still doing everything she wanted to do and was controlling the pain with medication. (R. 641, 643.) On May 19th, Plaintiff reported she was overall doing better but complained of more arthralgias in her hands and shoulders. (R. 639.) She made similar reports on May 25th and June 27th. (R. 635, 637.)

**B.** ***Opinion Evidence***

**1.** **<u>Treating Physician</u>**

Dr. Pellegrino filled out a Physical Capacity Evaluation form on October 27, 2015. (R. 603.) He indicated the following: Plaintiff was unable to work at the time; she had a twenty pound

lifting limit; she could stand cumulatively in an eight-hour day for one hour or less; she could sit cumulatively in an eight-hour day for two to four hours; she had a driving limit of two to four hours; she was to avoid all postural limitations except pulling; she would likely be absent more than two days per month; and the identified restrictions would be in effect for life. (*Id.*)

## 2. **Consulting Physician**

On October 23, 2014, Leo P. Potera, M.D., assessed Plaintiff to have the following limitations: she could lift and/or carry twenty pounds occasionally and ten pounds frequently; she could stand and/or walk for a total of six hours in an eight hour day; regarding postural limitations she could never climb ladders/ropes/scaffolds and all other postural positions she could do occasionally; and she was unlimited regarding environmental limitations except for needing to avoid concentrated exposure to humidity, hazards, and fumes, odors, dusts, gases, and poor ventilation. (R. 114-15.)

## C. *Hearing Testimony*

At the August 16, 2016, ALJ hearing, Plaintiff testified that she had last worked in 2011. (R. 59.) She identified her main problem to be chronic back pain which she rated as seven out of ten at the time of the hearing. (R. 66.) Plaintiff added that this assessment was her pain level with medication. (R. 67.) She stated that her symptoms, which included walking, standing, and

sitting, had been present for twenty years. (*See*, *e.g.*, R. 68-72.)
Plaintiff explained that she lost her job because she would have to
go home early and miss work due to back pain and numbness. (R.
85.)

Plaintiff stated that her back had gotten worse since she
stopped working. (R. 93.) She also testified that she spent the
entire day in bed about twice a week because of back pain and
numbness. (R. 94.)

## D. *ALJ Decision*

In his August 31, 2016, Decision, ALJ Balutis found that
Plaintiff had the following severe impairments: facet arthropathy;
degenerative disc disease of the lumbar spine; lumbar radiculopathy
without myelopathy; and osteoporosis. (R. 12.) The ALJ determined
that Plaintiff did not have an impairment or combination of
impairments that met or equaled a listed impairment. (R. 22.)

ALJ Balutis assessed Plaintiff to have the residual functional
capacity ("RFC") to perform light work

> except she could never climb ladders, ropes
> or scaffolds but could occasionally climb
> ramps and stairs, balance, stoop, kneel,
> crouch and crawl. The claimant is limited to
> frequent exposure to unprotected heights and
> dangerous moving machinery, humidity and
> wetness, dust, fumes, odors, gases and
> pulmonary irritants.

(R. 13.) With this RFC, the ALJ concluded Plaintiff was able to
perform her past relevant work. (R. 16.) On this basis, ALJ
Balutis determined that Plaintiff had not been under a disability

17

as defined in the Act from November 7, 2011, through the date of
the decision.  (*Id.*)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[1]  It is necessary for the
Commissioner to ascertain: 1) whether the applicant is engaged in a
substantial activity; 2) whether the applicant is severely
impaired; 3) whether the impairment matches or is equal to the
requirements of one of the listed impairments, whereby he qualifies
for benefits without further inquiry; 4) whether the claimant can
perform his past work; 5) whether the claimant's impairment
together with his age, education, and past work experiences
preclude him from doing any other sort of work.  20 C.F.R. §§

---

[1]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record. 20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process. *Id.*

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step four of the sequential evaluation process when the ALJ found that Plaintiff could perform her past relevant work as a shipping clerk/shipping checker, office clerk, and electrical assembler. (R. 16.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft*

19

*v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the ALJ to analyze all probative evidence and set out the reasons for his decision.  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (citations omitted).  If he has not done so and has not

sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary,

21

in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where a claimed error would not affect the outcome of a case, remand is not required. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As set out above, Plaintiff asserts the Acting Commissioner's determination should be reversed for the following reasons: 1) the ALJ failed to provide adequate explanation for ignoring evidence concerning absenteeism; 2) the ALJ's rejection of Plaintiff's claim that she, on frequent occasions, suffers from pain of sufficient intensity to preclude her attendance at work is not supported by substantial evidence; and 3) the ALJ fails to give appropriate weight to the opinion of the treating physician. (Doc. 9 at 8-9.)

### A. *Absenteeism Evidence*

Plaintiff first asserts that ALJ Balutis did not provide an adequate explanation for ignoring evidence concerning absenteeism, citing a Time and Attendance Employee Infraction Report showing seventy-two infractions from November 17, 2010, through October 24, 2011, and Dr. Pellegrino's absenteeism opinion. (Doc. 9 at 9 (citing R. 235-37, 603).) Defendant responds that the ALJ

considered Plaintiff's allegations that she was not able to get out of bed some days and her back pain would have prevented her from going to work every day and the claimed error would not be cause for remand because Plaintiff points to no probative evidence during the relevant time period which the ALJ failed to consider.  (Doc. 10 at 19-20 (citing R. 14, Doc. 9 at 9).)  The Court concludes Plaintiff has not shown error on the basis alleged.

Plaintiff quotes *Cotter v. Harris*, 642 F.2d 700, 705-06 (3d Cir. 1981), regarding the need for an ALJ to discuss the reason for rejecting probative evidence.  (Doc. 9 at 9-10.)  Following the quoted material, Plaintiff states "[t]he ALJ has very blatantly failed to meet the requirement" set out in *Cotter*. (*Id.* at 10.)

As noted by Defendant, most of the evidence cited by Plaintiff predates the alleged onset date, Plaintiff does not connect her absences to her back pain, and the absences which caused her termination were not related to her back problem but to October 2011 surgery.  (Doc. 10 at 20-21 (citing R. 235-37, 238-39, Doc. 9 at 9).)  Plaintiff does not directly refute these allegations, but asserts that the essence of her argument is that "she would be unable to attend work with sufficient frequency to maintain employment [and] [h]er excessive absenteeism, due to her too frequently disabling back pain, is what resulted in her loss of employment."  (Doc. 11 at 2.)  Following this assertion, Plaintiff reiterates it is unacceptable that the ALJ did not discuss the

issue or explain his rejection of the absenteeism evidence.
Plaintiff cannot meet her burden of showing error with these
conclusory statements.  (*Id.*)  This is particularly so in that
Plaintiff states that evidence predating her alleged onset date is
probative of her alleged disability but the absence record at issue
does not cite reasons for the absences, and Plaintiff does not seek
to correlate the absences with medical excuses after February 2009.
(*See* Doc. 9 at 9-10; Doc. 11.)

**B.   Pain Allegations**

Plaintiff next argues that ALJ Balutis's rejection of her
claim that she frequently suffers from pain that precludes her
attendance at work is not supported by substantial evidence.  (Doc.
9 at 10.)  Defendant responds that the determination is supported
by substantial evidence.  (Doc. 10 at 23.)  The Court concludes
Plaintiff has not shown that the alleged error is cause for
reversal or remand.

Plaintiff references episodes of work-precluding intense back
pain and asserts that treatments she received to treat her back
pain constitute medical evidence "consistent with the Plaintiff's
claim of disabling pain."  (Doc. 9 at 10.)  Plaintiff also states
"a variety of medical providers over the years have accepted
Plaintiff's complaints of pain and have set up numerous diagnostic
tests and have prescribed a variety of pain-killing drugs and other
treatments.  It is not the doctors, but only the ALJ, who expresses

24

skepticism about the Plaintiff's pain."  (Doc. 9 at 11.)

While it is true that providers have accepted Plaintiff's complaints and treated her pain, Plaintiff's statement misses the mark in that the existence of pain does not equate with disabling pain and disability under the Act.  As many decisions in the Third Circuit have noted, a claimant "need not be pain-free to be found 'not disabled.'"  *Morel v. Colvin*, Civ. A. No. 14-2934, 2016 WL 1270758, at *6 (D.N.J. Apr. 1, 2016) (citing *Lapinski v. Colvin*, Civ. A. No. 12-02324, 2014 WL 4793938, at *19 (M.D. Pa. Sept. 24, 2014)); *Pettway v. Colvin*, Civ. A. No. 14-6334, 2016 WL 5939159, at *19 (E.D. Pa. Apr. 8, 2016); *see also Welch v. Heckler*, 808 F.2d 264, 279 (3d Cir. 1986) (facts which supported the conclusion that pain may be constant and uncomfortable did not support the conclusion that it was disabling and severe).

The Court of Appeals for the Third Circuit has long held that subjective complaints of pain must be seriously considered and should not be discounted without contrary medical evidence, *see e.g.*, *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985), but here Plaintiff has not shown that the ALJ did not seriously consider her complaints of pain.  ALJ Balutis cited reports of pain and reports of pain relief with treatment, including reports of no pain and an ability to do all she wanted as of July 2015.  (R. 15.) The record review above indicates that the ALJ's assessment is consistent with the medical records and Plaintiff does not refute

reports of improvement to her providers or otherwise address the improvement documented in the record. To the extent Plaintiff states that she complained of disabling pain, she has not presented *evidence* which contradicts ALJ Blautis's finding that Plaintiff's pain was not disabling. Thus, Plaintiff has not met her burden of showing error on the basis alleged.

## C. *Treating Physician Opinion*

Plaintiff contends the ALJ failed to give appropriate weight to Dr. Pellegrino's opinion. (Doc. 9 at 11.) Defendant responds that substantial evidence supports the ALJ's assessment of the opinion. (Doc. 10 at 11.) The Court concludes Plaintiff has not shown that the claimed error is cause for reversal or remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.[2] *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20

---

[2] Though not applicable here, the regulations have eliminated the treating source rule for claims filed after March 27, 2017, and in doing so have recognized that courts reviewing claims have "focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our decision." 82 FR 5844-01, 2017 WL 168819, *at 5853 (Jan. 18, 2017). The agency further stated that in its experience in adjudicating claims using the treating source rule since 1991, the two most important factors for determining persuasiveness are consistency and supportability, which is the foundation of the new regulations. *Id.* Therefore, the new regulations contain no automatic hierarchy for treating sources, examining sources, or reviewing sources, but instead, focus on the analysis of these factors. *Id.*

C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[3] "A cardinal principle

---

[3] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as

guiding disability eligibility determinations is that the ALJ

accord treating physicians' reports great weight, especially when

their opinions reflect expert judgment based on continuing

observation of the patient's condition over a prolonged period of

time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)

(citations omitted); *see also Brownawell v. Commissioner of Social

Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject

the treating physician's assessment, an ALJ may not make

"speculative inferences from medical reports and may reject a

treating physician's opinion outright only on the basis of

contradictory medical evidence and not due to his or her own

credibility judgments, speculation or lay opinion."  *Morales*, 225

F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.

1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

In his Decision, ALJ Balutis stated "little weight is given to

the opinion of Dr. John Pellegrino (Exhibit 15F) as it is not well

supported by the overall objective medical evidence of record nor

Dr. Pellegrino's own medical records (Exhibits 14F, 19F, and 22F)."

(R. 15.)

Plaintiff states that the critical part of Dr. Pellegrino's

---

well as the factors in paragraphs (c)(3)
through (c)(6) of this section in determining
the weight to give the opinion. We will always
give good reasons in our notice of
determination or decision for the weight we
give your treating source's opinion.

opinion is that she will be absent more than twice a month and the
ALJ provides no explanation, other than in a conclusory statement,
regarding what medical records contradict the claim that
Plaintiff's back pain will frequently preclude her from attendance
at work.  (Doc. 9 at 12.)

Viewed independently, ALJ Balutis's assessment of Dr.
Pellegrino's opinion would not satisfy his obligation of explaining
the basis for his decision.  However, an ALJ is not required to use
specific language to explain a conclusion and the reviewing court
must read the decision as a whole to determine whether the ALJ's
finding is supported by substantial evidence.  *See*, *e.g.*, *Jones v.
Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  Here, ALJ Balutis has
provided sufficient analysis in his RFC assessment for the Court to
be able to conclude that his findings regarding Dr. Pellegrino's
opinion is supported by substantial evidence.  As noted by
Defendant, the ALJ summarized Plaintiff's treatment and noted
significant pain relief to each provider.  (Doc. 10 at 14 (citing
R. 15-16).)  Importantly, the ALJ noted, just two sentences before
his opinion assessment, that Plaintiff reported no pain and was
able to do everything she wanted by July 2015.  (R. 15.)  Plaintiff
does not acknowledge this evidence in her supporting brief nor does
she discount it in her reply brief.  (*See* Docs. 9, 11.)  Plaintiff
does not point to evidence which would require the conclusion that
she would be absent more than twice a month for a continuous twelve

month period from the alleged onset date through the date of the decision.  (*See id.*)  Certainly evidence that a claimant had no pain and was able to do everything she wanted is substantial evidence supporting the conclusion that the opinion that she was unable to work for life was entitled to little weight.  This is particularly so when Plaintiff continued to report the effectiveness of the July 15, 2015, ablation and limited back pain through the date of the decision.  (*See* R. 620, 635, 637, 641, 651, 653, 743.)

## V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal of the Acting Commissioner's decision is properly denied.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: July 11, 2018